AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 3:23-mj-367 |
| 3023 North Dixie Drive, Apartment 1, Dayton, Ohio 45414 | ) ) ) |

**FILED**
RICHARD W. NAGEL
CLERK OF COURT

9/8/2023

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841 & 846 | Possession with Intent to Distribute Controlled Substances and Conspiracy to Commit the Same. |

The application is based on these facts:

See attached Affidavit and Attachment C

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Dustin Phillips, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date: September 8, 2023

City and state: Dayton, Ohio

_____
Caroline H. Gentry
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT SEARCH WARRANT APPLICATION

I, Dustin J. Phillips, a Task Force Officer ("TFO") for both the Federal Bureau of Investigation ("FBI") and City of Dayton Police Department ("DPD"), after being duly sworn, declare and state:

## INTRODUCTION

1.     I have been employed as a law enforcement officer for the past sixteen (16) years. I currently serve as a Detective with the DPD. I am presently a TFO with the FBI Dayton Resident Office's Safe Streets Task Force (SSTF). As such, I have been sworn under the Title 21, United States Code ("U.S.C."), Section 878, to serve as an officer of the United States duly empowered to conduct federal criminal investigations and execute arrests for criminal violations of Titles 18 and 21 of the U.S.C.

2.     I am also a TFO with the DPD's Major Case/Drug Enforcement Unit within the Special Investigations Bureau. Since 2013, I have concentrated on the investigation of: narcotics, firearms, and gang-related criminal cases. During my law enforcement career, I have participated in numerous firearm-related arrests, executions of search warrants resulting in the seizure of large quantities of narcotics and firearms, numerous undercover narcotics purchases, and supervised the activities of numerous police informants who provided law enforcement authorities valuable and accurate information and assistance resulting in numerous undercover narcotics purchases and apprehensions. I have participated in numerous narcotics investigations which focused on the possession, manufacture, distribution, and importation of controlled substances, and the subsequent tracking of criminal proceeds generated from such illicit activities. Based on my prior law enforcement training and experience and extensive interaction with other experienced FBI special agents, TFOs, and local narcotics investigators, I have become familiar with the typical

1

manner in which drug traffickers and their organizations operate within the United States. Based on my said training and experience, I have become aware of the common modus operandi employed by criminals involved in the illicit distribution of controlled substances, to wit:

a.  It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using third party names in order to avoid detection by law enforcement officials.

b.  It is also common practice for drug traffickers to maintain residences as "stash houses" to store drug inventories and distribute drugs. They additionally have been known to use "nominees" to obtain telephone service, utility service, and other services in order to hide their true identity.

c.  It is also common practice for drug traffickers to place assets in corporate entities in order to avoid detection by law enforcement officials.

d.  It is also common practice for drug traffickers to place these assets while continuing to de facto exercise dominion and control over them.

e.  It is also common practice for drug traffickers to possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f.  It is also common practice for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. These books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g.  It is also common for drug traffickers to provide false information to law enforcement officials regarding their true identity and the address of their actual residence.

h.  It is also common for drug traffickers to conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.  It is also common for drug traffickers to amass large amounts of criminal proceeds from the sale of drugs and attempt to hide the true source of these profits, otherwise known as money laundering. To accomplish this, drug traffickers commonly utilize banks and/or financial institutions with their attendant services, including but not

2

limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j.      It is also common for drug traffickers to travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k.      It is also common for drug traffickers to maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l.      It is also common for drug traffickers to take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m.      It is also common for drug traffickers to have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.      It is also common for drug traffickers to maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.      It is also common for drug traffickers to refrain from stating exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms while speaking over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of

3

drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.  It is also common for drug traffickers to use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q.  It is also common for drug traffickers to save past communication in text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r.  It is also common for drug traffickers to distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3.  I make this affidavit in support of an application for a search warrant for the residential premises known as 3023 North Dixie Drive, Apartment 1, Dayton, Ohio 45414, including any outbuildings, basements, garages, or sheds located on its curtilage (hereinafter "**Location 1**"). **Location 1** is more fully described in Attachment A-1, which is incorporated herein by reference. As detailed below, I submit that probable cause presently exists to believe that certain evidence of drug trafficking, to wit: Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and conspiracy to commit same in violation of Title 21, United States Code, § 846 can and will be found inside **Location 1**.

4.  A list of specific items to be seized from **Location 1** is attached hereto and marked

4

as Attachment B which is incorporated herein by reference. Based on my prior law enforcement training and experience, as well as the facts set forth in this affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at **Location 1.**

5. I have not included every factual detail known to subject investigation, but only such information deemed necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located at **Location 1**.

## **PROBABLE CAUSE**

6. On February 8, 2023, Montgomery County Common Pleas Judge Mary Katherine Huffman issued a search warrant in Case No. 23CRJ274 for premises located at 3023 North Dixie Drive, Apartment 1 believed to be then occupied by **ANTHONY JACOB SMEDLEY SR.** and **NATALIE NICOLE FOLEY,** (hereinafter referred to as "**SMEDLEY**" and "**FOLEY**"). The said state search warrant was executed on February 9, 2023. Both **SMEDLEY** and **FOLEY** were found present at the subject premises. Both individuals were detained by law enforcement officials prior to the entry team going inside the premises. No other people were found located inside the subject house.

7. A search of the subject residence led to the discovery and seizure of several items of evidence including but not limited to two (2) loaded firearms, several baggies of narcotics, and items of possessory interest linking both **SMEDLEY** and **FOLEY** to this residence. Both **SMEDLEY** and **FOLEY** were arrested on state charges following the execution of the state search warrant. Both individuals were subsequently released pending the results of the forensic drug analysis by the crime laboratory.

8. All of the said seized baggies which contained suspected narcotics were submitted to the Hamilton County Crime Laboratory (HCCL) for forensic testing. The HCCL has confirmed

that all the suspected narcotics found inside the residence were in-fact controlled substances. (See Attachment "C" to this affidavit). The following is a list of confirmed narcotics located inside the house: five (5) baggies of methamphetamine, a Schedule II controlled substance, weighing a total of 156.1 grams; one (1) baggie of a mixture of Fentanyl, also known as N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, a Schedule II controlled substance, fluorofentanyl, an analog of Fentanyl, and medetomidine, weighing a total of 2.837 grams; and one (1) baggie containing a mixture of Fentanyl, also known as N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, a Schedule II controlled substance, fluorofentanyl, an analog of Fentanyl, acetyl fentanyl, an analog of Fentanyl, methamphetamine, a Schedule II controlled substance, and medetomidine, weighing 1.046 grams.

9.     On March 13, 2023, a Miami Valley Crime Stoppers tip call was received indicating that **SMEDLEY** was still actively engaging in drug trafficking from **Location 1**.

10.     On or about August 28, 2023, your Affiant met with a Confidential Informant (CI). This CI had previously provided your Affiant with information that has been found to be true, accurate, and reliable through the use of various corroborating investigative techniques. This CI has also previously provided law enforcement authorities with reliable and trustworthy information that led to the issuance of search warrants and the subsequent discovery and seizure of narcotics and weapons. In the opinion of your Affiant, this CI has been established himself/herself to be at all times trustworthy, reliable, accurate and truthful.

11.     On or about August 31, 2023, your Affiant met with the same CI for the purpose of attempting to plan and organize a controlled buy of narcotics from **Location 1**. Prior to said controlled buy, this CI was checked for the presence of drugs and money on his person by law enforcement authorities. None were found on CI's person. The CI was thereafter provided a sum

of money from the DPD Buy Fund and was directed to **Location 1**. DPD Sergeant Jason E. Rhodes took up a position of surveillance and observed the CI approach the front door of **Location 1** as he/she was let inside the premises. A short time later, the CI exited the same door and returned to your Affiant. At that point in time, the CI turned over a certain amount of suspected methamphetamine which was purchased from a male individual inside the residence. The CI was again searched for the presence of drugs and money on his/her person. None were found. The CI indicated **SMEDLEY** was in-fact the person who conducted the drug sale inside the front door of **Location 1**.

12.     The suspected methamphetamine recovered from the CI had the same appearance and consistency as methamphetamine your Affiant has recovered previously in his law enforcement career. I conducted a methamphetamine field test, which returned a positive result indicating the presence of methamphetamine. This suspected methamphetamine was tagged into the DPD Property Room. This suspected methamphetamine was thereafter submitted to the HCCL for forensic analysis.

13.     On September 8, 2023, law enforcement authorities conducted a "trash pull" outside of **Location 1**. Your Affiant personally examined the contents of the seized trash for the possible presence of any relevant evidence. Inside the said trash was discovered several items of interest, to wit: a piece of mail addressed to **FOLEY** at **Location 1**, and an empty 100-count box of sandwich baggies, together with several individual plastic baggies. There were two-quart sized Ziploc bags, two full sandwich bags, and four pieces of sandwich bags. One of the Ziploc bags had the corner torn from it Based on my prior law enforcement training and experience, I am aware that this is a common technique used in drug trafficking. At least one of the sandwich bags contained a small amount of white powder residue inside. Your Affiant conducted a fentanyl field

test on this residue. This field test reported positive results for the presence of fentanyl. Photographs were taken of all the items recovered and each were tagged into the DPD Property Room. The baggies were submitted to the HCCL for confirmatory forensic tests.

14. Based on my prior law enforcement training and experience, I am aware that plastic baggies are commonly used by drug traffickers to package individual amounts of narcotics for sale. It is also not uncommon for drug traffickers to purchase large amounts of narcotics, which are often packaged in larger baggies, then break this product down into smaller baggies for distribution. The presence of several larger baggies and multiple smaller baggies and baggie pieces indicates evidence of suspected large scale trafficking operation.

### CONCLUSION

15. Based on the facts set forth in this Affidavit, I believe probable cause exists to conclude that evidence of drug trafficking activity will be found inside **Location 1**. Specifically, it is your Affiant's belief that evidence of violation of Title 21, United States Code §§ 841(a)(1) and 846, can and will be found inside **Location 1**

Dustin J. Phillips
Task Force Officer
Federal Bureau of Investigation

Sworn and subscribed before me via telephone on this ___8th___ day of September 2023.

Caroline H. Gentry
United States Magistrate Judge

**ATTACHMENT A-1**

**LOCATION TO BE SEARCHED**

**Location 1:** The place to be searched is 3023 North Dixie Drive, Apartment 1, Dayton, Ohio 45414 and the surrounding curtilage. 3023 North Dixie Drive, Apartment 1, Dayton, Ohio is a single apartment located inside a multi-unit structure located at 3021-3023 North Dixie Drive. Apartment 1 is more specifically described as the north unit located on the first floor of the said building. 3021-3023 North Dixie Drive is a two-story building with blue and gray siding and white trim. 3021-3023 North Dixie Drive is located on the west side of North Dixie Drive. 3021-3023 North Dixie Drive, Dayton, Ohio 45414 is further depicted in the following photograph.



E21 17403 0053 09/22/2018

## ATTACHMENT B

### PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A.    Logbooks, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.    Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.    Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.    Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.    Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F.    United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.    Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H.    Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I.    Illegal drugs, including but not limited to methamphetamine, fentanyl, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J.    Firearms and ammunition.



# HAMILTON COUNTY CRIME LABORATORY

Hamilton County Coroner & Crime Laboratory
4477 Carver Woods Drive, Blue Ash, Ohio 45242
Crime Laboratory: 513-946-8750 Fax: 513-946-8772



## OFFICIAL CRIME LABORATORY REPORT

**To:** Detective Orndorff
Dayton Police Department

**C.L. FILE #** CL23-01076 Report #1
**Date Range of Analysis** February 15, 2023 - March 10, 2023
**SUSPECT(S)** Smedley, Anthony

Property #484986

**EXAMINATION REQUESTED BY:**
Same

**TYPE OF EXAMINATION REQUESTED:**
Drugs

The following is a report of the Crime Laboratory giving the results of examinations conducted on specimens received from your office. This examination has been made with the understanding that the specimen is connected with an official investigation of a criminal matter and the laboratory report will be used for official purposes only, related to the investigation or a subsequent criminal prosecution. Authorization cannot be granted for the use of this report in connection with a civil proceeding.

**SPECIMENS:**

1-1  white solid material which was weighed and analyzed
   1-1 was contained in a plastic bag within a plastic bag within a manila envelope.
   1-1 was selected from two plastic bags each containing white solid material.
1-2  white solid material which was weighed and analyzed
   1-2 was contained in a plastic bag within a plastic bag within a manila envelope.
1-3  crystalline material which was weighed and analyzed
   1-3 was contained in a plastic bag.
1-4  crystalline material which was weighed and analyzed
   1-4 was contained in a piece of plastic within a plastic bag.
1-5  crystalline material which was weighed and analyzed
   1-5 was contained in a plastic bag.
   1-3, 1-4, and 1-5 were selected from five total plastic bags containing crystalline material,
   all within an outer plastic bag and a manila envelope.

From observations made and results of chemical testing and/or instrumental analysis performed by me on the aforesaid items, the following statement of findings is made:

| EXHIBIT | WEIGHT | SUBSTANCES IDENTIFIED | SCHEDULE | UNIT DOSES |
|---------|--------|----------------------|----------|------------|
| 1-1 | 2.837 ± 0.008 grams | fluorofentanyl | I* | - |
| | | fentanyl | II | - |
| | | medetomidine | none | - |
| 1-2 | 1.046 ± 0.008 grams | acetyl fentanyl | I | - |
| | | fluorofentanyl | I* | - |
| | | methamphetamine | II | - |
| | | fentanyl | II | - |
| | | medetomidine | none | - |
| 1-3 | 56.0 ± 0.5 grams | methamphetamine | I | - |
| 1-4 | 55.1 ± 0.5 grams | methamphetamine | II | - |
| 1-5 | 45.0 ± 0.5 grams | methamphetamine | II | - |

Items 1-3, 1-4, and 1-5, weighing a combined total of 156.1 ± 0.15 grams and each determined to contain methamphetamine, exceeds fifty times the bulk amount by weight for a schedule II stimulant that is not in final dosage form.



ATTACHMENT "C"

C.L. FILE #    CL23-01076 Report #1              DATE    March 10, 2023

**Additional Information:**

\* The positional isomer for fluorofentanyl cannot be determined at this time due to current testing procedures and resources. All isomers of para-fluorofentanyl are considered schedule I under Section 4729:9-1-01(B) of the Ohio Administrative Code.

The bulk amount of a schedule II stimulant is defined by section 2925.01(D)(1)(g) of the Ohio Revised Code as an amount equal to or exceeding three grams of a compound, mixture, preparation, or substance that is or contains any amount of a schedule II stimulant, or any of its salts or isomers, that is not in a final dosage form.

A color test, and gas chromatography/mass spectrometry were used to analyze items 1-1, 1-2, 1-3, 1-4, and 1-5.

If a measurement uncertainty has been provided for a weighed item(s), it is expressed at a coverage probability of 99.73%.

Alexis Smith

Alexis Smith
Forensic Scientist I

                                        3/27/2023
                                        Date Approved

DISPOSITION OF EVIDENCE: The evidence is returned to the submitting/investigating agency upon completion of examination.

TO THE ACCUSED:
    You have a right to demand the testimony of the person making this report; except when the report is used as part of the preliminary hearing or the Grand Jury proceeding, upon giving notice prior to the trial to the Prosecuting Attorney in accordance with the Rules of Criminal Procedure.



## HAMILTON COUNTY CRIME LABORATORY
The Hamilton County Coroner & Crime Laboratory
4477 Carver Woods Drive, Blue Ash, Ohio 45242
Crime Laboratory: 513-946-8750 Fax: 513-946-8772



I, Alexis Jo Smith, first being duly cautioned and sworn, depose and say that:

I have been an employee of the Hamilton County Coroner & Crime Laboratory, 4477 Carver Woods Drive, Blue Ash, Ohio 45242, since July 12, 2022.

Performance of such analyses as listed in the attached report is a regular part of my duties.

My educational qualifications include: a Bachelor of Science in Forensic Chemistry from Ohio University in Athens, Ohio, and instrumentation and extensive training in the analysis of cannabis from my fellow analysts at my present place of employment.

In the analyses listed in the attached report, scientifically accepted tests were performed with due caution and the evidence was handled in accordance with established and accepted procedures while in laboratory custody.

*Alexis J. Smith*
Alexis J. Smith

State of Ohio
County of Hamilton

Sworn and subscribed before Me on the
27th day of MARCH , 2023

Notary Public